UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JORDAN KROLICK, *individually*, and
TOUND & DROWTH, LLC, *a Georgia
Limited Liability Company*,

                                     Plaintiffs,

                    v.

ALEX SLOANE and MATTHEW
PERELMAN,

                                     Defendants.

No. 17-CV-0881 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs Jordan Krolick and Tound & Drowth, LLC commenced this action asserting

contractual, quasi-contractual, and related claims, against Defendants Alex Sloane and Matthew

Perelman. The claims arise from the alleged breach of a purported oral contract between the parties

to form a franchise holding company in the "quick service restaurant" ("QSR") industry. After

the Court held oral argument on Defendants' motion to dismiss the initial Complaint, Plaintiffs

filed an Amended Complaint. Now before the Court is Defendants' motion to dismiss that

Amended Complaint. For the following reasons, the motion is granted in part and denied in part;

namely, Plaintiffs' claims for unjust enrichment and quantum meruit survive while all others fail.

## BACKGROUND

The following facts are drawn from the Amended Complaint and are assumed to be true

for the purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

## I. The Parties

Krolick alleges that he is a "restaurant industry veteran" who has served as a consultant, board member, and advisor to well-established and start-up businesses in the restaurant, retail and "consumer-focused industries." Dkt. 57 ("Amended Compl.") ¶ 10. He previously worked as Chief Development Officer for Arby's Restaurant Group and as Head of Mergers and Acquisitions for McDonald's. *Id.* ¶ 11–12. Now, through his single-member company that he owns and operates, Tound & Drowth, LLC, Krolick "help[s] consumer-focused chains achieve their next level of success." *Id.* ¶¶ 6, 11. Defendants Sloane and Perelman are the founders of Cambridge Franchise Holdings, LLC and Cambridge Franchise Real Estate, LLC (collectively, "Cambridge"), a "high profile and prominent multi-unit franchisee of various brands in the United States." *Id.* ¶ 4. In April 2019, Carrols Restaurant Group purchased 165 Burger King restaurants and 55 Popeyes restaurants from Cambridge for $238,000,000. *Id.*

## II. The Yum! Brands Arrangement

In November 2013, Defendants were working with GLG Research to find an executive with experience in the QSR industry who could assist them in establishing a new QSR franchise holding company. *Id.* ¶ 15. On November 4, 2013, a GLG representative emailed Krolick to inform him that Defendants were

> in the process of setting up a new QSR franchise holding company and ha[ve] already raised sufficient funds to do so. Their goal is to open 20–40 locations in the first year of operations and quadruple that within 5 or so years, ultimately holding between 100–150 locations . . . They are seeking a true partner, who will be given significant equity in the company. These two gentlemen have significant investing expertise, but need to connect an experienced quick service restaurant executive with franchise development experience and the operating knowledge and skills needed to make this successful.

2

*Id.* ¶ 17 (emphasis omitted).  The email also notes that the position "is an equity play with significant upside for the operator if he/she is successful." *Id.* ¶ 18 (emphasis omitted).  Between November 4, 2013, and January 26, 2014, Krolick engaged in telephone conversations with Defendants regarding the franchise industry. *Id.* ¶ 19.  On January 27, 2014, Defendants retained Krolick "on a mutually agreed test basis for a limited two-week trial advisory engagement concerning an already-identified, multiple store potential opportunity with Yum! Brands at a discounted rate of $2,000 per week with a token $5,000 success fee based on the two weeks of effort." *Id.* ¶ 20.  This agreement was memorialized in writing.  *See* Dkt. 64-1.  The purpose of the trial engagement was to give the parties an opportunity to get to know one another.  Amended Compl. ¶ 20.  On February 18, 2014, Defendant Sloane paid Krolick $4,000 by personal check for the trial engagement.  *Id.* ¶ 21.  The Yum! Brands deal ultimately never materialized, however, and so the success fee was neither due nor paid.  *Id.* ¶ 22.

### III. The Parties Allegedly Form a Business

Plaintiffs assert that, "[a]t the conclusion of the trial engagement," Defendants told Krolick that "they wanted to continue their relationship with Krolick continuing to serve in an advisory capacity" on an "as-needed" basis.  *Id.* ¶¶ 24, 27.  Plaintiffs attest that Defendants sought to "form [a] business with Krolick," to which Krolick would contribute "his guidance, analysis, expertise and counsel."  *Id.*  In exchange, Krolick would receive "a 3% success fee for any initial acquisition which would then simultaneously be 'rolled-over' into [a] small, minority interest in the future company."  *Id*. ¶ 24.  Plaintiffs claim that "[i]t was agreed that Krolick's role, besides advice, direction and credibility, was also to ensure that Defendants Sloane and Perelman's lack of current experience, at that time, would not impact a potential transaction."  *Id*. ¶ 28–29.  "It was also agreed that Krolick would be available to Defendants . . . at essentially any and all times including

3

evenings and late at night." *Id*. Plaintiffs state that this "business" was formed through "a series of conversations, emails, meetings and exchanges of documents, memoranda and information." *Id*. ¶ 36. They do not identify any of the foregoing "emails, . . . documents, [an]d memoranda" nor elaborate on the substance of those communications, and it appears that neither Defendants' purported offer nor Plaintiffs' purported acceptance was memorialized in writing.

## IV. The Burger King Deal

In "late March or early April 2014," Defendants learned of an opportunity to acquire approximately 23 Burger King restaurants in North Carolina. *Id*. ¶ 37. Plaintiffs allege that Defendants sought Krolick's assistance and counsel in connection with the contemplated transaction. Plaintiffs present a list of 27 tasks Krolick allegedly performed to effectuate the transaction, including evaluating deal terms, analyzing financials, assessing store spaces, researching market competition, and analyzing store operations. *Id*. ¶ 42. Although they do not specify a precise date, Plaintiffs assert that at some point "[p]rior to August 20, 2014," Defendants "verbally confirmed" with Krolick that he would "receive [a] 3% success fee which he simultaneously agreed to 'roll-over' to equity in the business in exchange for his services." *Id*. ¶ 48. In light of this compensation arrangement—which, unlike the parties' previous agreement with respect to Yum! Brands, was never reduced to a writing—Plaintiffs claim that Krolick did not record his time nor send Defendants invoices, contrary to his usual practice of charging clients an hourly rate. *Id*. ¶ 53.

On August 20, 2014, Defendants informed Krolick that they had successfully acquired the 23 Burger King restaurants. *Id*. ¶ 56. During a telephone conversation two days later, Defendants allegedly shouted to Krolick: "You have Equity! Equity! Equity!"—which, according to Plaintiffs, was a reference to Krolick's 3% equity interest in the parties' joint business. *Id*. ¶ 58–59. Plaintiffs

4

maintain that subsequent to the closing of the Burger King transaction, "Krolick played a vital role in helping Defendants . . . create their organizational compensation philosophy" and providing them with guidance regarding "organizational design, operations, development, store remodeling and other issues as they arose." *Id.* ¶ 61.  On October 23, 3014, Krolick visited some of the acquired North Carolina stores to observe and review operations. *Id.* ¶ 62.

In November 2014, Defendants requested that Krolick provide them with an invoice for his time and expenses in connection with the October 23, 2014 visit. *Id.* ¶ 68.  Plaintiffs contend that Krolick initially refused, but that Defendants insisted on compensating Krolick for the site visit. *Id.* ¶ 63.  Plaintiffs allege that Krolick agreed to waive his daily rate of $3,000 by 75%, issuing an invoice for $750 of his time, because he "understood that he already owned 3% of the equity in the business . . . for his past services performed." *Id.* ¶ 68.  Thereafter, Krolick continued to assist Defendants with the North Carolina Burger King restaurants by, among other things, engaging in conferences regarding financial and remodeling issues. *Id.* ¶ 70.

**V. The Starbucks Deal**

In January 2015, the parties commenced due diligence on an opportunity to acquire Starbucks locations in Puerto Rico. *Id.* ¶ 72–73.  Plaintiffs assert that Defendants prepared a detailed Strategic and Financial Plan for Starbucks in which they stated that Krolick had "worked closely" with Defendants "as an advisor to [their] Burger King business." *Id.* ¶ 75.  Krolick then joined Defendants on their visit to Starbucks corporate offices during March 25–26, 2015 in Seattle, Washington. *Id.* ¶ 76.  The Starbucks opportunity was awarded to a different group. *Id.* ¶ 77.

On April 22, 2015, Krolick received an unsolicited request from Defendants to send an invoice in the amount of $20,000 as compensation for 10 weeks of "time and services with the

Starbucks transaction." *Id.* ¶¶ 78–81.  As with the prior November 2014 invoice, Krolick responded that the payment was not necessary.  *Id.* ¶ 81.  He nonetheless sent Defendants the $20,000 invoice in response to their subsequent demand for one on April 23, 2015.  *Id.* ¶ 82.  After sending the invoice, "Krolick attempted to remain in communication with [Defendants] but encountered increasing difficulties and unresponsiveness."  *Id.* ¶ 83.  Plaintiffs do not allege that they ever discussed Krolick's purported equity interest in the "business" during this time.

Months later, at some point in 2016—the month and day of which are not specified in the Complaint—Krolick requested that Defendants send him a Form K-1 in order for him to complete his tax returns.  *Id.* ¶ 85.  Defendants denied the request, insisting that Plaintiffs did not have equity in their business.  *Id.*  Plaintiffs assert that Krolick—unlike in 2014 and 2015—now made "numerous attempts to raise th[e] issue" and to "seek closure" on Defendants' "exclusion of [his] 3% equity interest in the business."  *Id.*  They state that Defendants "disdainfully rebuffed [Krolick's] efforts, including cancelling phone calls, refusing to have any conversations and lying about prior facts."  *Id.*  Finally, Plaintiffs claim that the growth of Defendants' business into one that owns and operates over 100 QSRs and other franchised businesses would not have been possible without Krolick and the "critical advice" he allegedly provided to the purported joint business.  *Id.* ¶ 89.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a Rule 12(b)(6)

6

motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (internal citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35 (citation omitted).

## DISCUSSION[1]

## I. Contractual Claims

Plaintiffs' claims for breach of contract and breach of an implied contract stem from the same alleged agreement to exchange 3% equity in Defendants' company for Krolick's assistance in acquiring franchises and growing their business.[2]  Because the terms of the purported oral contract lack definition—specifically, they do not spell out with any clarity what Krolick agreed to do—Plaintiffs cannot establish the existence of a contract as a matter of law.  These claims, accordingly, cannot withstand Defendants' motion to dismiss.

---

[1] The parties' briefs assume that New York law governs Plaintiffs' claims.  "[S]uch implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).  The Court therefore applies New York law in deciding this motion.

[2] As an initial matter, the Court is unpersuaded by Defendants' argument that certain allegations in support of the contract claims in Plaintiffs' Amended Complaint "directly contradict those in the original Complaint" and thus should not be considered by the Court.  Dkt. 63 at 10–12.  Here, unlike in Defendants' cited cases, Plaintiffs' original contention that the parties agreed to form a joint venture is not factually incompatible with Plaintiffs' new allegation that the parties contracted to form a "business." *Cf. Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 CIV. 9865 LMM, 2011 WL 4058100, at *4 (S.D.N.Y. Sept. 1, 2011) (declining to accept as true the assertion that a tax reserve fund was not created because prior pleadings alleged that a tax reserve fund *was* created); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 CIV 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (finding that a plaintiff "blatantly change[d] his statements of the facts" by alleging that he was employed as a "specialist" in an amended pleading, but as an "attorney" in his initial complaint).

### A.  Breach of Bilateral Contract

Under New York law, for a plaintiff to state a claim for breach of contract, he must first adequately allege the existence of such a contract.  *See VisionChina Media Inc. v. Shareholder Representative Servs., LLC*, 109 A.D.3d 49, 58 (N.Y. App. Div. 2013).  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal quotations omitted).  Contracts can be made orally or in writing.  *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  However, "where an alleged contract is oral, plaintiff has a particularly heavy burden to establish objective signs of the parties' intent to be bound."  *N.F.L. Ins. by Lines v. B & B Holdings*, 874 F. Supp. 606, 613 (S.D.N.Y. 1995).  In addition, a proponent of an oral contract "must demonstrate that the terms of any agreement are definite."  *Canon Inc.v. Tesseron Ltd.*, No. 14-cv-5462 (DLC), 2015 WL 4508334, at *6 (S.D.N.Y. 2015) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 171 (2d Cir. 2014)).  "Under New York law, an agreement is enforceable if a meeting of the minds has occurred as to the contract's material terms."  *Major League Baseball Properties, Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 270–71 (S.D.N.Y. 2005) (citation and quotation omitted).

Here, Plaintiffs allege that Krolick contracted with Defendants to "provid[e] his services in exchange for Defendants' promise and agreement that Krolick would receive [3%] equity" in Defendants' company.  Amended Compl. ¶ 26.  The material terms of this alleged agreement are ambiguous at best, especially with regard to what Krolick promised to do for Defendants.  Although Plaintiffs' Amended Complaint includes myriad details about the tasks Krolick performed to effectuate the Burger King transaction, *id.* ¶ 42, it contains no allegations that the parties contemplated, at the time the contract was allegedly entered into, that Krolick would be

performing this work in exchange for equity.  Indeed, Krolick states only that at the time of contract, his role in the company was understood to be to provide "advice, direction and credibility" and to "ensure that Defendants['] . . . lack of current experience, at that time, would not impact a potential transaction."  *Id.* ¶ 28.[3]  New York courts have found oral assurances lacking definite terms in a purported contract insufficient to establish that the parties possessed an intent to be bound.  *See Hecht v. Helmsley-Spear, Inc.*, 65 A.D.3d 951, 951–52 (N.Y. App. Div. 2009).  Here, the Court similarly finds that there was no meeting of the minds as to the contract's material terms evincing the parties' intent to form a binding agreement.

Plaintiffs cite several cases in which New York courts have concluded that a lack of definiteness in contract terms was not fatal to the contract at issue.  These citations are unavailing, however, because the facts of those cases are meaningfully different than the facts presented here.  In *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co*., the plaintiff contracted to buy a set amount of a product and "more . . . if . . . the defendant can get more."  133 N.E. 370, 370 (N.Y. 1921) (alteration adopted).  The defendant argued that this term was indefinite because it was unclear how much the plaintiff was required to buy.  *Id.* at 371.  The New York Court of Appeals disagreed, concluding that it would be clear to merchants like the parties that "the buyer is to fix the quantity."  *Id.*  In *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp*., the contract at issue did not set a price and instead allowed the price to be set by one of the parties "in accordance with . . . all

---

[3] The Amended Complaint is also unclear about when, how, and where the terms of the alleged contract were negotiated or the contract was entered into.  It states only that the alleged business was formed "[i]n and after March 2014" through "a series of conversations, emails, meetings and exchanges of documents, memoranda and information" that are never identified or elaborated upon.  Amended Compl. ¶ 36; *see Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., LLC*, 455 F. App'x. 102, 104 (2d Cir. 2012) (finding relevant, *inter alia*, that a plaintiff alleging the existence of an oral contract did not provide any information about "the formation of the contract" or "the date it took place"); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (same).

applicable rules and regulations." 548 N.E.2d 203, 207 (N.Y. 1989). The Court of Appeals similarly held that this contract term was not fatally indefinite because the price term "c[ould] be determined objectively without the need for new expressions by the parties." *Id*. at 206. Here, the Court cannot objectively determine the terms of this alleged contract. Nor do Plaintiffs contend that the indefinite contract term—"advice, direction and credibility"—is a term of art that persons in the parties' industry would necessarily understand. To the extent that Krolick's role was not well-defined due to "the uncertain nature of transactional work-flow," Amended Compl. ¶ 25, this cannot overcome the legal requirement of definiteness. *See Maffea v. Ippolito*, 247 A.D.2d 366, 367 (N.Y. App. Div. 1998) ("An agreement to agree, which leaves material terms of a proposed contract for future negotiation, is unenforceable.").

As Plaintiffs' cited cases convey, "[f]ew principles are better settled in the law of contracts than the requirement of definiteness." *Cobble Hill*, 548 N.E.2d at 206. Here, because the terms of the contract lack definiteness, the Court finds as a matter of law that no contract existed between the parties, and thus Plaintiffs cannot sustain a claim for breach of contract. Plaintiffs' breach of contract claim is therefore dismissed.[4]

---

[4] Defendants also assert that the alleged agreement could not have been performed within one year and that Plaintiffs' claim for breach of contract is therefore barred by New York's statute of frauds. Oral agreements violate the statute of frauds when "by their very terms [they] have absolutely no possibility in fact and law of full performance within one year." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y. 2d 449, 454 (1984). "It does not matter whether performance within a year is 'unlikely or improbable.'" *Diedhiou v. Republic of Senegal & Teranga, LLC*, No. 20 CIV. 5685 (ER), 2021 WL 4461014, at *3 (S.D.N.Y. Sept. 29, 2021) (citing *Foster v. Kovner*, 840 N.Y.S.2d 328, 331 (N.Y. App. Div. 2007)). Defendants argue that the purported agreement could not have been performed within one year because Krolick agreed to advise Defendants on an ongoing basis with regard to future opportunities. Dkt. 63 at 14. But nothing in the alleged terms of the agreement necessarily precluded the possibility that the parties could have successfully acquired QSRs and terminated the relationship within one year. *See Am. Credit Servs., Inc. v. Jay Robinson Chrysler/Plymouth, Inc.*, 615 N.Y.S.2d 175, 176 (N.Y. App. Div. 1994) (holding that the statute of frauds was inapplicable to an agreement that "could have been terminated by either party at any time" although it was "capable of an indefinite continuance"). As such, the statute of frauds does not provide a basis for dismissal of Plaintiffs' contractual claims.

### B.  Breach of Unilateral Contract

A unilateral contract is a contract in which the offer invites acceptance not in the form of a promise, but rather, in the form of actual performance.  *See Ingrassia v. Shell Oil*, 394 F. Supp. 875, 882 (S.D.N.Y. 1975).  "In unilateral contracts the consideration is the performance of the specified act or acts."  *Id*.  As previously noted, the Complaint does not allege any specific acts Krolick was required to perform under the purported contract.  Thus, the Court dismisses the claim for breach of unilateral contract for the same reason it dismisses the claim for breach of bilateral contract.

### C.  Breach of Implied Contract

Under New York law, "[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct.'"  *Jemzura v. Jemzura,* 36 N.Y. 2d 496, 503–04 (1975) (internal citation omitted).  Plaintiffs allege that the parties' conduct "in and after March 2014 and by their subsequent communications in the weeks and months that followed" demonstrates that they mutually assented to an implied contract.  Amended Compl. ¶ 113.  But proof of an implied-in-fact contract requires proof of the same elements as an express contract*.  See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93–94 (1999).  The breach of implied contract claim is, therefore, dismissed for the same reasons as the above claims for breach of contract.

## II. Fraud and Negligent Misrepresentation

The Complaint further fails to adequately allege a claim for fraud and negligent misrepresentation.

### A. Fraud

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for fraud claims.  To satisfy Rule 9(b), a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted).

To state a claim for fraud under New York law, Plaintiffs must allege "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).  Defendants argue that Plaintiffs have not sufficiently pled the alleged fraud with the particularity that Rule 9(b) demands, nor Defendants' knowledge of falsity.  At the very least, Defendants are correct that the Complaint lacks facts "that give rise to a strong inference of [Defendants'] fraudulent intent." *Space Hunters, Inc. v. United States*, 500 F. App'x 76, 78–79 (2d Cir. 2012).

Plaintiffs allege that Defendants made fraudulent statements both before and after Defendants successfully acquired the 23 North Carolina Burger King restaurants.  According to Plaintiffs, before the Burger King deal closed, Defendants represented "on several occasions that in exchange for [Krolick's] consulting and advisory services, Krolick would receive a 3% success fee in the eventual form of a 3% equity interest in the franchise businesses acquired and operated if a transaction was consummated."  Amended Compl. ¶ 133.  Similarly, Plaintiffs allege that "[p]rior to August 20, 2014, Krolick verbally confirmed with Defendants . . . that he was going to

receive [a] 3% success fee which he simultaneously agreed to 'roll-over' to equity in the business in exchange for his services." *Id.* ¶ 48.  But these statements merely reflect future promises to perform an act—which, under New York law, more properly form the basis of a breach of contract claim—as opposed to misrepresentations of present facts, which are necessary to state a fraud claim.  *See Christians of Cal., Inc. v. Clive Christian N.Y, LLP*, No. 13-CV-275 (KBF), 2015 WL 468833, at *4–5 (S.D.N.Y. Feb. 23, 2015).

By contrast, Plaintiffs allege that, after "Defendants closed on the Burger King transaction and acquired 23 restaurants in North Carolina on August 22, 2014," Defendants "shout[ed] 'You have Equity! Equity! Equity!'" to Krolick over the phone, and that Krolick "confirmed with Defendants . . . during the call that his equity interest was 3% so there would be no confusion." Amended Compl. ¶¶ 56, 58.  In light of this statement, Plaintiffs allege that Krolick was induced to continue to work for Defendants by, among other things, reviewing financial statements Defendants allegedly sent to Krolick on October 22, 2014; visiting some of the acquired Burger King restaurants with Defendants to observe operations on the following day; and playing a "vital role" in providing guidance on "organizational design, operations, development, store remodeling and other issues as they arose." *Id.* ¶¶ 60–61.  Defendants' alleged statement that Plaintiffs had equity—which refers to a statement of present fact, and for which Plaintiffs have identified the date, location, and speakers—could potentially form the basis of a fraud claim.  *See Lefkowitz v. Reissman*, No. 12-CV-8703 (RA), 2014 WL 925410, at *10–11 (S.D.N.Y. Mar. 7, 2014).

Nevertheless, Plaintiffs fail to plausibly support an inference of fraudulent intent—*i.e.*, that Defendants did not intend to provide Plaintiffs with a 3% equity interest in their business at the time they allegedly stated that Krolick had such equity.  The requisite strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both

13

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52.  The Complaint's conclusory allegation that Defendants confirmed Krolick's equity interest on August 22, 2014 "with the intent to deceive Plaintiffs, for the purpose of inducing Plaintiffs to act upon them by providing services," Amended Compl. ¶ 138—absent any other facts bearing on Defendants' motive to commit fraud or recklessness—does not pass muster under Rule 9(b).  *See Jiaxing Hongyu Knitting Co. v. Allison Morgan LLC*, No. 11-CV-09342 (AJN), 2013 WL 81320, at *3 (S.D.N.Y. Jan. 8, 2013) (rejecting as "bare and conclusory allegations without any factual support" the plaintiff's claims that the defendants made "false, deceitful, fraudulent, and [] bad faith" representations "against [their] actual intent").  Plaintiffs' fraud claim is therefore dismissed.

### B.  Negligent Misrepresentation

"To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 82 (S.D.N.Y. 2010).  In addition, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20–21 (2d Cir. 2000).

As noted in the prior discussion of Plaintiffs' fraud claim, the alleged misrepresentations made prior to the closing of the Burger King deal amount to "[p]romises of future conduct" that are therefore "not actionable as negligent misrepresentations." *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987).  With respect to Defendants' alleged misrepresentations made after the Burger King deal closed, Plaintiffs' negligent misrepresentation claim is still defective because

Plaintiffs cannot establish that a "special relationship" existed between the parties.  "A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'"  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (citing *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)).  Here, as Plaintiffs acknowledge, it was *Krolick* who possessed the "specialized expertise", not Defendants.  Thus, Plaintiffs' theory that Defendants owed them a duty of care arising from a special relationship is unsupported and the Court does not discern an independent basis to find that such a relationship existed.  Plaintiffs' negligent misrepresentation claim is, therefore, dismissed.

### III. Quasi-Contractual Claims

In contrast to the others, Plaintiffs' final claims for unjust enrichment and quantum meruit survive.  As an initial matter, "[q]uantum meruit and unjust enrichment do not constitute separate causes of action and may therefore be addressed as a single claim."  *Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-CV-2280 (ER), 2015 WL 3504208, at *9 n.22 (S.D.N.Y. June 2, 2015) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).  Indeed, "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit . . . is one measure of liability for the breach of such a contract."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175.  Put more simply, "in order to recover on a claim of quantum meruit, a party must prove the existence of unjust enrichment."  *Growblox Scis., Inc.*, 2015 WL 3504208, at *9 n.22.

Establishing unjust enrichment under New York law requires a plaintiff to show: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448

F.3d 573, 579 (2d Cir. 2006).  Here, Plaintiffs assert that the services Krolick purportedly provided to Defendants—which, among other things, included consultation in connection with the Burger King transaction with respect to "financial issues, franchise issues, restaurant operations, remodeling issues and deal terms," Amended Compl. ¶ 70—were purportedly integral to the consummation of the Burger King transaction, due to Krolick's expertise in the QSR industry. Plaintiffs further allege that they expected to be compensated for their services.  *Id.* ¶ 48.  And while they received $4000 for the Yum! Brands engagement, $750 for the October 23, 2014 Burger King site visit, and $20,000 for their work on the Starbucks deal, Plaintiffs have alleged that they did not receive any compensation for five months of work on the Burger King transaction, other than for the one-day site visit.  *Id.* ¶ 53.  Drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that they have plausibly alleged that Defendants have been unjustly enriched at their expense; thus, it would be premature to foreclose the possibility of quantum meruit recovery. Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is therefore denied.[5]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' claims for breach of

---

[5] Plaintiffs are nonetheless reminded that "[i]n order to recover in quantum meruit," they will need to establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) *the reasonable value of the services*."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175 (emphasis added).  Plaintiffs suggest that the reasonable value of their services is the "promised and specified 3% equity share of at least $238,000,000 – meaning $7,140,000 at a minimum."  Dkt. 68 at 21.  In doing so, they conflate their potential recovery under the dismissed contract claims with their entitlement under an unjust enrichment theory.  "A quantum meruit claim is proper if it seeks compensation for the reasonable value of the work performed rather than the benefit of the bargain."  *Shtofmakher v. David*, No. 14 CIV. 6934 AT, 2015 WL 5148832, at *9 (S.D.N.Y. Aug. 17, 2015); *KJ Roberts & Co. v. MDC Partners, Inc.*, 605 F. App'x 6, 7 (2d Cir. 2015) ("Roberts cannot recover under a quasi-contract theory by simply affixing the label 'quantum meruit' to the very contract claim that is barred.") (internal citation omitted).  However, because Plaintiffs assert elsewhere in their Complaint that their standard consulting rate is $3000 per day, Amended Compl. ¶ 68, the Court finds that Plaintiffs have adequately alleged the reasonable value of the services they performed.

contract, breach of an implied contract, fraud, and negligent misrepresentation, is granted with prejudice.  Defendants' motion to dismiss Plaintiffs' claims for unjust enrichment and quantum meruit is denied.  The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 62.

The parties are ordered to appear for a telephonic status conference on November 30, 2021 at 10:30 a.m.  The following dial-in information may be used to call in to the conference: Call-in Number: (888) 363-4749; Access Code: 1015508.  This line is open to the public.  No later than November 23, 2021, the parties shall submit a revised Case Management Plan and Scheduling Order.  A template for the order is available at: https://www.nysd.uscourts.gov/sites/default/files/practice_documents/raCivilCaseManagementAndSchedulingOrder12012015.pdf.

SO ORDERED.

Dated:      November 12, 2021
                 New York, New York

                                                                          _____
                                                                          Ronnie Abrams
                                                                          United States District Judge